**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)**

| | | |
|---|---|---|
| **RAFAEL M. CRUZ,** *et al.***,** | **:** | **Case No. 3:16-CV-292** |
| | **:** | |
| **Plaintiffs,** | **:** | |
| | **:** | **Judge Thomas M. Rose** |
| **v.** | **:** | |
| | **:** | |
| **PNC BANK NATIONAL** | **:** | |
| **ASSOCIATION,** *et al.***,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS PNC BANK AND
THE PNC FINANCIAL SERVICES GROUP'S MOTION TO DISMISS  (DOC # 14)**

---

### I.  <u>INTRODUCTION</u>

For years, Defendants, PNC Bank, National Association and The PNC Financial Services

Group, Inc. (collectively, "PNC"), played an indispensible role in a Ponzi scheme perpetrated by

William Apostelos and his cronies, in which Apostelos bilked more than $66.7 million from at

least 350 investors from across the country, including business persons, professionals, retired

police officers and retired factory workers.  PNC aided in the Ponzi scheme by, among other

things, allowing its facilities to be used by Apostelos to conduct his illegal activities, acting as

the primary channel through which Apostelos funneled his pilfered funds, and subverting,

ignoring or making exceptions to banking rules and regulations in order to facilitate the scheme.

Indeed, numerous transactions totaling millions of dollars took place each month in Apostelos'

primary PNC account that were not consistent with any legitimate business activity.  Such

activity would have never taken place in a *bona fide* business account.  Apostelos' account

instead bore all of the obvious earmarks of a money laundering operation – an absolutely crucial

tool in running the Ponzi scheme, given Apostelos' need to take in and distribute funds from and among multiple victims in an inconspicuous, expedited manner.

In the face of significant best practices "red flags," likely violations of the Bank Secrecy Act and relevant anti-money laundering regulations, PNC conducted business with Apostelos and assisted the expansion of the Ponzi scheme, providing the banking infrastructure for funds to be moved out of Apostelos' PNC accounts. Confronted now with its role in a devastating Ponzi scheme costing investors millions of dollars, PNC looks to shed its responsibility for the harm it facilitated. Rather than own up to its violations of Ohio's securities laws, PNC asks this Court to dismiss the Complaint, claiming the law does not apply to PNC. Although PNC fits squarely within the cross-hairs of Ohio law imposing liability on companies participating in or aiding in any way with the sale of illegal securities, PNC asks this Court to carve out an exception for its conduct – for "standard commercial banking activity" – that does not exist under Ohio law. Fortunately for the investing public, Ohio securities law is clear – PNC is not above the law and, as detailed in the Complaint, must be held accountable for its role in the exploitation of the victims.

## II.    FACTS AND BACKGROUND

For more than four years, Apostelos, with the assistance of his wife, his sister, his niece and other associates, perpetrated a Ponzi scheme against Plaintiffs and other investors. (ECF No. 1, ¶ 2). During that time, Apostelos, individually and through his various companies, raised more than $66.7 million from at least 350 investors from across the country.[1] *Id.* Apostelos portrayed himself as a sophisticated investor and businessman, and he exploited his network of clients, business associates and friends to attract new investors. *Id.* Many investors, including

---

[1] Unless obvious from the context or otherwise specified, William Apostelos, his accomplices, and various companies are hereinafter collectively "Apostelos."

the Plaintiffs, invested their retirement savings and lost their investments to the scheme. *Id*.

To perpetrate his scheme, Apostelos formed numerous companies. In September 2009, Apostelos formed Midwest Green Resources, LLC ("Midwest Green"). *Id*. at ¶ 24. Midwest Green purported to be in the business of investment and real estate asset management. *Id*. Between May 2010 and August 2014, Apostelos raised money from investors by offering and selling membership units in Midwest Green (hereinafter the "Midwest Green Securities"). *Id*. at ¶ 24. During this four-year period, Apostelos and Midwest Green conducted two unregistered offerings of Midwest Green Securities – purported equity interests in Midwest Green – during which they raised approximately $9.8 million from at least 60 investors. *Id.* at ¶ 25.

Similarly, on October 19, 2009, only a month after forming Midwest Green, Apostelos formed WMA Enterprises, LLC, a company purported to be in the business of investment and real estate asset management. *Id*. at ¶ 27. Between January 2010 and October 2014, Apostelos, through WMA, raised at least $56.9 million from approximately 330 investors, primarily by issuing promissory notes offering high, guaranteed rates of interest (hereinafter the "Promissory Note Securities"). *Id*. at ¶ 28. The Midwest Green Securities and the Promissory Note Securities are securities as defined in the Ohio Securities Act, O.R.C. § 1707.01, *et seq*. *Id*. at ¶ 24, 28.[2]

Using his companies and his connections, Apostelos defrauded hundreds of investors, including the Cruzes. Beginning in 2011 and continuing into 2012, Apostelos sold Dr. Rafael M. Cruz various Unregistered Securities with a total value of more than more than $3.3 million. *Id*. at ¶ 54. During that same timeframe, Apostelos sold Dr. Rafael F. Cruz various Unregistered Securities with a total value of nearly $190,000. *Id*. at ¶ 59. And, beginning in 2012 and continuing into 2014, Apostelos sold Dr. Gloria M. Cruz various Unregistered Securities with a

---

[2] Throughout this Opposition, the Midwest Green Securities and the Promissory Note Securities will be collectively referred to as the "Unregistered Securities."

total value of more than $2.3 million. *Id*. at ¶ 56. All of the Plaintiffs' unregistered securities are now worthless. *Id*. at ¶¶ 55, 58 and 61.

Overall, the amount of money PNC funneled through its accounts is staggering. From at least May 2010, PNC played an indispensible role in Apostelos' fraudulent operations and success. *Id*. at ¶ 6. Indeed, Apostelos deposited virtually all of the money raised from selling the Unregistered Securities into one primary PNC business account (the "8143 Account"), from which he made so-called monthly interest payments to investors. *Id*. Between January 2010 and October 29, 2014, Apostelos deposited more than $84,000,000 of investor funds into PNC business bank accounts, with more than $66,000,000 passing through the 8143 Account alone. *Id*. at ¶¶ 35 52. Of the $66,000,000, approximately $45,000,000 was deposited from investors (more than $1,420,000 per month); $8,900,000 were transfers from other Apostelos Entities business accounts (*e.g*., Midwest Green) that received investor funds; more than $4,900,000 was deposited from known investment companies; and $737,000 in cash was deposited. *Id*. at ¶¶ 35, 50. Of the $66,000,000 deposited into the 8143 Account, more than $17,121,850 was transferred into personal or other business accounts controlled by Apostelos. *Id*. at ¶¶ 35, 51. Of the investor proceeds transferred into personal or other business accounts, more than $1,902,685 (more than $32,000 per month on average) was withdrawn by Apostelos in cash or funds converted into cashier checks. *Id*. at ¶ 51.

Dating back to early 2010, PNC had information indicating Apostelos was undertaking banking activities indicative of someone who was operating a fraudulent scheme and/or laundering money. *Id*. at ¶ 43. Thus, PNC knew or should have known Apostelos was using the PNC accounts to launder money as part of some larger criminal undertaking. *Id*. Rather than investigating Apostelos, PNC was primarily concerned with maintaining a relationship with him

and collecting fees from the banking activity generated. *Id*. at ¶ 44. Indeed, PNC cultivated a close relationship with Apostelos and committed considerable resources to assist in the management of his many accounts. *Id*. The 8143 Account was one of the largest handled by the local PNC branch, and PNC assigned at least two senior employees – branch managers – the task of assisting in various banking transactions executed by Apostelos and his associates over a four-year period. *Id*. These senior bank employees supervised and effectuated daily deposits, withdrawals, and transfers of large sums of money on behalf of Apostelos. *Id*.

Apostelos could not have carried out his unlawful securities selling program without the assistance provided by PNC. *Id*. at ¶ 46. The money Apostelos raised from new sales largely served to cover obligations to existing investors. *Id*. The viability of the Ponzi scheme hinged upon Apostelos' ability to sustain fluid turnover of funds. *Id*. Without PNC providing Apostelos an avenue through which he could funnel investors' funds, Apostelos would not have been able to sell the Unregistered Securities to Plaintiffs. *Id*. at ¶ 53. PNC took steps, through one or more of its local branch employees, to actively promote the scheme and made exceptions for Apostelos to its typical banking rules. *Id*. at ¶ 48. As a result of PNC's involvement, investors continued for years pouring money into the Ponzi scheme through the sale by Apostelos of Unregistered Securities. *Id*. at ¶ 49.

Accordingly, Plaintiffs, personally and on behalf of other victims who invested money with Apostelos that was funneled through PNC accounts, filed this action seeking to hold PNC liable for its role in the sales. More specifically, in accordance with Section 1707.43(A) of the Ohio Securities Act, Plaintiffs have elected to void the sales of the securities and are seeking recovery from PNC because it participated in or aided Apostelos in making the sales. PNC filed the instant motion arguing it cannot be liable because it engaged only in "standard commercial

5

banking activities". (ECF No. 14-1, PageIDs 94-101). As set forth below, PNC's argument

cannot sustain a dismissal of Plaintiffs' claims.

## III.    THE OHIO SECURITIES ACT

PNC argues, "banks engaged in normal commercial activity are not liable for aiding

unlawful sales of securities." *Id*. at 95. However, PNC ignores how broadly courts, including

this one, have nearly universally construed Ohio's securities laws. So before turning to PNC's

specific arguments for dismissal, it is important to consider the expansive reach of the Ohio

Securities Act (the "OSA"), O.R.C. §§ 1707, *et seq*., including the primary section at issue here.

> Chapter 1707 of the Ohio Revised Code [aka 'Ohio's Securities
> Act' or 'Ohio's Blue Sky laws'] governs the sale and purchase of
> securities in Ohio. Its purpose is 'to prevent the fraudulent
> exploitation of the investing public through the sale of securities.'
> *In re Columbus Skyline Securities, Inc*., 74 Ohio St.3d 495, 498,
> 1996 Ohio 151, 660 N.E.2d 427, 429 (Ohio 1996). The Ohio
> Securities Act requires securities to be registered and salespersons
> and dealers to be licensed, and it proscribes fraudulent conduct.
> *See* O.R.C. §§ 1707.08 – 1707.13 (registration); §§ 1707.14 –
> 1707.19 (licensing); §§ 1707.41, 1707.44 (proscribing fraud).
> Courts have liberally construed the Act to effectuate its remedial
> purpose. *See, e.g., In re Columbus Skyline*, 74 Ohio St.3d at 498,
> 660 N.E.2d at 429; *Federated Mgmt. Co. v. Coopers & Lybrand*,
> 137 Ohio App.3d 366, 391, 738 N.E.2d 842, 860-61 (Ohio Ct.
> App. 2000).

*In re Nat'l Century Fin. Enters., Inc*., 755 F.Supp.2d 857, 873 (S.D.Ohio 2010).

Indeed, "[m]any of the enacted [securities] statutes are remedial in nature, and have been

drafted broadly to protect the investing public…," *see Bronaugh v. R. & E. Dredging Co*., 16

Ohio St.2d 35, 242 N.E.2d 572 (1968), and, "[i]n order to further the intended purpose of the

Act, its securities anti-fraud provisions must be liberally construed." *In re Columbus Skyline*, 74

Ohio St.3d at 498.

Here, Plaintiffs alleged they were sold Unregistered Securities by Apostelos. (ECF No.

1, ¶¶ 54-61, 70-82). The sale of securities to Plaintiffs violated Ohio's Securities Act. (*Id*. at ¶

76). Apostelos is, therefore, liable to Plaintiffs for the illegal sales. But Ohio securities law does

not limit liability for the illegal sale of securities to just the primary actor. Secondary liability

can be extended to others. Section 1707.43(A) of the OSA, entitled "Remedies of purchaser for

unlawful sale," provides in pertinent part:

> (A) Subject to divisions (B) and (C) of this section, every sale or
> contract for sale made in violation of Chapter 1707 of the Revised
> code, is voidable at the election of the purchaser. The person
> making such sale or contract for sale, and every person that has
> participated in or aided the seller in any way in making such sale
> or contract for sale, are jointly and severally liable to the
> purchaser…. (emphasis added).

This court recently explained the broad scope of Section 1707.43. In *In re Nat'l Century*,

Judge Graham held:

> A secondary actor need not commit fraud to be liable; the
> secondary actor need only participate in or aid the sales
> transaction. Joint and several liability extends to "every person
> that has participated in or aided the seller in any way in making
> such sale or contract for sale." O.R.C. § 1707.43(A). The statute
> does not require knowledge, intent, or any other mental state on the
> part of secondary actor, nor does it require reliance, inducement, or
> proximate cause as between the secondary actor and purchaser. *See
> Nickels v. Koehler Mgmt. Corp.*, 541 F.2d 611, 616 (6th Cir. 1976)
> (noting that rescission is available under § 1707.43 "without a
> showing of reliance"); *Federated*, 137 Ohio App.3d at 391, 738
> N.E.2d at 861 ("R.C. 1707.43 does not require that a person induce
> a purchaser to invest in order to be held liable. Rather, the
> language is very broad, and participating in the sale or aiding the
> seller in any way is sufficient to form a basis for liability under
> R.C. 1707.43.").
>
> The statute simply requires an act of participation or assistance in
> the sale and some form of remuneration, either direct or indirect.
> *See* O.R.C. § 1707.431(B) (remuneration requirement, which is
> waived for investment advisers). Indeed, one Ohio court has
> referred to the statute as creating a strict liability standard. *Ryan v.
> Ambrosio*, 2008 Ohio 6646, 2008 WL 5258308, at *4 (Ohio Ct.
> App. 2008)…Courts have held that § 1707.43 imposes liability on
> persons who introduce investment opportunities, serve as conduits
> of information, act as intermediaries in the exchange of money and
> securities, and arrange meetings between buyers and sellers. *See,*

> *e.g., Johnson v. Church of the Open Door*, 179 Ohio App.3d 532, 541, 2008 Ohio 6054, 902 N.E. 2d 1002, 1009 (Ohio Ct. App. 2008); *Boland v. Hammond*, 144 Ohio App.3d 89, 94, 2001 Ohio 2680, 759 N.E.2d 789, 793 (Ohio Ct. App. 2001); *Perkowski v. Megas Corp.*, 55 Ohio App.3d 234, 235, 563 N.E.2d 378, 379 (Ohio Ct. App. 1990); *Gerlach v. Wergowski*, 65 Ohio App.3d 510, 514, 584 N.E.2d 1220, 1222 (Ohio Ct. App. 1989).
>
> Ohio's imposition of secondary liability thus targets the sales transaction….

755 F.Supp.2d at 884-885.

In addition, in analyzing the broad protections given the investing public, this Court also held, "'[i]t must be emphasized that R.C. 1707.43 uses very broad language.'" *In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F.Supp.2d 287, 307-308 (S.D.Ohio 2007) (quoting *Federated Mgmt.*, 137 Ohio App. 3d at 392), and the language "participated in or aided the seller in any way" is "broad in scope and extends beyond the actual seller and issuer of the security." *Escue v. Sequent, Inc.*, S.D.Ohio No. 2:09-cv-765, 2010 U.S. Dist. LEXIS 87043, at \*39-42 (Aug. 24, 2010) (relying upon *Federated Mgmt.*, 137 Ohio App.3d at 391).

Further still, because Section 1707.43 is a remedial statute, as with other remedial statutes, "[f]ollowing traditional canons of statutory interpretation, [it] should be construed broadly to extend coverage and [its] exclusions or exceptions should be construed narrowly." *Passa v. City of Columbus*, S.D.Ohio No. 2:03-CV-81, 2007 U.S. Dist. LEXIS 78905, at \*18-21 (Oct. 24, 2007) (citing *Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 559 (6th Cir. 2006)). *See also Wukelic v. United States*, 544 F.2d 285, 288 (6th Cir. 1976) (holding remedial statutes must be "construed liberally" and "exceptions… should be construed narrowly."). The application of Section 1707.43 begins and ends with its plain wording. *See, e.g., Brilliance Audio, Inc. v. Haights Cross Commc'n, Inc.*, 474 F.3d 365, 371 (6th Cir. 2007) ("As with any question of statutory interpretation, we must first look to the language of the statute itself."); *Pittsburgh &*

8

*Conneaut Dock Co. v. Director, Office of Workers' Compensation Programs*, 473 F.3d 253, 266 (6th Cir. 2007) ("In all cases of statutory construction, the starting point is the language employed by [the legislature] . . . [and] where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (citing *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995) (internal quotation marks omitted)); *Limited, Inc. v. C.I.R.*, 286 F.3d 324, 332 (6th Cir. 2002) ("[W]e look first to the plain language of the statute.").

With the operative statute put in proper context, PNC's misplaced pleas for dismissal are considered.

## IV.    <u>ARGUMENT</u> [3]

PNC makes two arguments in support of its Motion: (1) Plaintiffs have failed to properly allege PNC's wrongdoing (ECF No. 14-1, PageID 99-101); and (2) there is an exemption or exception under the OSA for "standard commercial banking activity" (*Id.* at 94-99). Both of PNC's arguments fail. Plaintiffs have pled sufficient facts in their Complaint demonstrating a connection to the described abuses, PNC's knowledge of the scheme, its actions to facilitate the scheme, and the requisite scienter (if any) to survive a motion to dismiss Plaintiffs' OSA claims. *See W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888 (S.D.Ohio 2014) (denying Rule 12(b)(6) motion to dismiss plaintiffs' OSA and fraud claims, where the investors pled sufficient facts suggesting a systemic abandonment of underwriting guidelines, a connection to the described abuses, and the requisite scienter). And, there is no statutorily or judicially recognized exception under the OSA for "standard commercial banking activity".

### A.    **Plaintiffs have properly alleged PNC participated in or aided in any way Apostelos in the sale of securities in violation of Section 1707.43.**

With respect to claims brought under Section 1707.43, "the Ohio statute does not carry a

---

[3]   This Court is certainly aware of the standard to be applied in deciding a motion under Rule 12(b)(6).

heightened pleading standard, nor is it accompanied by a body of law…requiring particularized allegations of involvement….” *In re Nat'l Century Fin.*, 504 F.Supp.2d at 307-308.  This is in part because Ohio's securities laws are required to be liberally construed.  *Id*.  Here, the Complaint far exceeds the applicable pleading standard including alleging PNC took steps, through one or more of its local branch employees, to actively promote the scheme and made exceptions for Apostelos to its typical banking rules including, but not limited to:

- Approving millions of dollars in suspicious outgoing transfers and checks from 8143 Account and other Apostelos related accounts;

- Approving millions of dollars in transfers from 8143 Account to other Apostelos related business and personal accounts;

- Authorizing overrides to funds or account holds to give Apostelos access to immediate cash and allow immediate transactions to occur;

- Adopting special rules related to Apostelos' extraordinary cash withdrawals, including arranging for Apostelos to provide advance notice of his cash needs so the local bank branch could ensure it had sufficient cash on hand to fund the withdraws;

- Failing to file a SAR; and

- Failing to shut down the Apostelos accounts in the face of overwhelming evidence of fraud.

(ECF No. 1, ¶ 48).

Moreover, the Complaint details how PNC knew or should have known Apostelos was using the PNC accounts to launder money as part of some larger criminal undertaking.  *Id*. Specifically, the information PNC had included, but was not limited to:

- Opening by Apostelos and his associates of multiple business and personal accounts within a short period;

- Apostelos and his associates were operating multiple businesses out of the same office;

- Account activities that were not consistent with any of the Apostelos Entities activities;

- Multiple accounts under various names for no apparent legitimate reason;

- Inter-account transfers for no apparent legitimate reason;

- Rapid and significant account activity occurring shortly after the accounts were opened with a minimal initial deposit;

- Numerous transfers from business accounts to personal accounts;

- Unusual transfers of funds occurred among related accounts;

- Wire transfers and checks routinely made or payable to Apostelos to investors in implausible whole-dollar amounts;

- Frequent deposits and/or withdrawals of large amounts of cash with no apparent legitimate business reason;

- The frequency and size of deposits and withdrawals were not consistent with the types of businesses Apostelos operated;

- The businesses operated by Apostelos were not the type known for generating substantial amounts of cash;

- The accounts had high volumes of activity and large transaction amounts, but carried low balances;

- Numerous deposits were frequently followed by almost immediate requests for transfers into other Apostelos accounts and/or other accounts with no legitimate business explanation;

- Numerous deposits of relatively small incoming wire, cash, check and other monetary instruments were followed closely by outgoing wire transfers into other Apostelos accounts and/or other accounts with no legitimate business explanation;

- Multiple cash withdrawals by Apostelos in amounts just under the amount triggering mandatory reporting requirements;

- Frequent large cash deposits and withdraws, but no use of PNC's other banking services; and

- Substantial cash deposits into an escrow account followed by transfers to other Apostelos accounts.

*Id*. at ¶ 43.

In short, Plaintiffs clearly allege PNC actively participated in or aided in any way the sale

of the Unregistered Securities, knew or should have known Apostelos was using the PNC

accounts to further his Ponzi scheme, and failed to take any action – other than rake in fees from

Apostelos' transactions – for more than four years.

### B. There is no exemption to R.C. 1707.43 for "standard commercial banking activities."

The primary basis for PNC's Motion is its argument that there is an exception or

exception to the OSA for "standard commercial banking activity" (ECF No. 14-1, PageID 99).

That is, PNC contends the Complaint alleges nothing more than "PNC provided only standard

commercial banking services to Apostelos through business and personal depository accounts

that Apostelos had established."  (ECF No. 14-1, PageID 91).

Assuming there was a statutory or judicially-recognized exception for PNC's self-

proclaimed "standard commercial banking activity," the Complaint includes allegations of

conduct in aid of the criminal scheme that goe far beyond such activity.  The Complaint sets

forth  allegations that PNC took steps, through one or more of its local branch employees, to

actively promote the scheme and made exceptions for Apostelos to its typical banking rules (*e.g.,*

authorizing overrides to funds or account holds to give Apostelos access to immediate cash and

allow immediate transactions to occur and adopting special rules related to Apostelos'

extraordinary cash withdrawls, including arranging for Apostelos to provide advance notice of his

cash needs so the local bank branch could ensure it had sufficient cash on hand to fund the

withdrawls).  (ECF No. 1, ¶ 48). [4]

The Complaint sets forth facts demonstrating much more than "standard commercial

banking activities," and far exceeds the low threshold for the Court to find Plaintiffs' alleged

---

[4]  Of course, if the "standard commercial banking" exception that PNC urges existed, it would constitute an
affirmative defense which PNC must plead and prove, not an element of Plaintiffs' claim, and is therefore
inappropriate for determination at this stage.

facts support a viable legal theory. As important, there is no exception or exemption to Ohio's remedial securities statute for "a bank engaging in standard commercial banking activities." *Id*. at 94. PNC's position here is contrary to Ohio law and belied by the plain wording of the statute.

The OSA imposes liability for the sale of illegal securities on "[t]he person making such sale or contract for sale, and **every person that has participated in or aided the seller in any way** in making such sale or contract for sale…." O.R.C. § 1707.43 (emphasis added). The statute could not be clearer. If PNC aided Apostelos "in any way" in the sale of illegal securities or participated in the sale, it is liable. The breadth of the statute has been affirmed by Ohio courts without exception. The statute does not provide an exemption for actions characterized as "standard commercial banking activities."[5] This suggested exemption appears nowhere in O.R.C. § 1707.43, and to read this exemption into the statute now would be to narrow its scope and thereby reduce the protection given by the Ohio Legislature to the investing public.

PNC asks the Court to dismiss the Complaint because "plaintiffs do not allege that PNC underwrote the Apostelos investments, drafted prospectuses, marketed Apostelos' membership units and promissory notes, organized investor meetings, communicated with investors about their investments, or did anything else related to the marketing or sale of securities." *Id*. at 99. In essence, PNC attempts to create an exhaustive list of potentially culpable conduct to fit under its fabricated exemption, but Ohio courts have considered several factors in deciding whether a person or entity shall be responsible for the sale of illegal securities under R.C. 1707.43(A), and even those factors considered to date are not comprehensive. Whether a defendant participated or aided in any way in the sale of securities is, of course, fact intensive and not subject to a Rule 12(b)(6) dismissal of a well-pleaded Complaint, as demonstrated by the fact the Ohio Legislature

---

[5]  Assuming *arguendo* there is a judicially recognized exemption for "standard commercial banking activities," whether PNC's actions would fall within such an exception is a factual matter.

did not define necessary conduct in the statute.

In short, PNC's attempt to limit the "in any way" language to cases where defendants do not perform "standard commercial banking activities" ignores the guidance of nearly every court that has considered the breadth of the statute. *See Federated Mgmt.*, 137 Ohio App.3d at 391-392 (finding for the plaintiffs); *see also Vasa Order v. Rosenthal Collins Grp.*, *L.L.C*., C.P. No. CV 11 753705, 2013 Ohio Misc. LEXIS 3, at *15 (Ohio Jan. 29, 2013) (finding for the plaintiffs); *Wells Fargo Bank v. Smith*, 12th Dist. Brown No. CA2012-04-006, 2013-Ohio-855, ¶ 27; *Hild v. Woodcrest Asso*, 59 Ohio Misc. 13, 28-29, 391 N.E.2d 1047 (C.P.1977) (finding for the plaintiff); *In re Columbus Skyline*, 74 Ohio St.3d at 498; *In re Nat'l Century Fin*., 755 F.Supp.2d at 873-874.

Moreover, even if there were a judicially-recognized exemption under the OSA for "standard commercial banking activities" – there is not – such an exemption is not an element of Plaintiffs' statutory claim, and it would not be Plaintiffs' responsibility to plead any such exemptions. Rather, the exemption would presumably be an affirmative defense for PNC to prove later, outside the realm of a Rule 12(b)(6) motion. *See Passa*, 2007 U.S. Dist. LEXIS 78905 at *13 ("Exemptions to [remedial] statutes must be specifically pled as an affirmative defense or will be deemed waived."). As set forth above, Plaintiffs have met their pleading requirement to overcome a Rule 12(b)(6) motion, and PNC cannot hide behind some exemption to the OSA of their own making.

Despite the unassailable language of the statute and authority requiring broad application of Ohio's securities laws, PNC points to four cases it contends support its position "that banks engaged in normal commercial activity are not liable for aiding unlawful sales of securities." (ECF No. 14-1, PageID 95, citing *Wells Fargo*, 2013-Ohio-855; *Boomershine v. Lifetime*

*Capital, Inc.*, 2d Dist. Montgomery No. 22179, 2008-Ohio-14; *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, S.D.Ohio No. 2:03-md-1565, 2006 U.S. Dist. LEXIS 72154 (Oct. 2, 2006); *Hild*, 59 Ohio Misc. 13). Procedurally, three of these cases were decided on summary judgment, rather than Rule 12 motions. *Wells Fargo*, 2013-Ohio-855 at ¶1; *Boomershine*, 2008-Ohio-14 at ¶6; *Hild*, 59 Ohio Misc. at 32. Thus, the legal standard is completely different – notice pleading as opposed to evaluating evidence garnered through discovery. In addition, all four cases are factually distinguishable and do not stand for the propositions advanced by PNC.

First, PNC cites *Hild* in passing for the proposition, "For nearly forty years, Ohio courts have held that 'the willingness of a bank to become the depository of funds does not amount to a personal participation or aid in the making of a sale' under Ohio Rev. Code § 1707.43." (ECF No. 14-1, PageID 95). Not only does the Complaint allege far more than PNC merely becoming a depository bank, but PNC takes out of context this observation by the *Hild* court.

In observing "the willingness of a bank to become the depository of funds does not amount to a personal participation or aid in making of a sale," the *Hild* court cited *Sorenson v. MacElrod*, 286 F.2d 72 (5th Cir. 1960). *Hild*, 59 Ohio Misc. at 31. The issue in *Sorenson*, however, was that under Florida Supreme Court precedent, to be have personally participated or aided in making an illegal security sale, the defendant must have engaged in "some activity in inducing the purchaser to invest." *Sorenson*, 286 F.2d at 74. So under Florida law, the activity of a bank merely agreeing to become a depository of funds was not inducement of a purchaser to invest and, therefore, could not rise to the level of participating or aiding in the sale of a security.

The requirement of inducement by a secondary actor is not the law in Ohio, and the conclusion reached by the *Sorenson* court has been soundly rejected by Ohio courts, including this one. *See In re Nat'l Century Fin.*, 755 F.Supp.2d at 884-885 ("The statute does not require

knowledge, intent, or any other mental state on the part of the secondary actor, nor does it require reliance, inducement, or proximate cause as between the secondary actor and purchaser); *Federated Mgmt.*, 137 Ohio App.3d at 391 ("R.C. 1707.43 does not require that a person induce a purchaser to invest in order to be held liable.  Rather, the language is very broad, and participating in the sale or aiding the seller in any way is sufficient to form a basis for liability under R.C. 1707.43").  To the extent the *Hild* court relied upon Florida law for a proposition that has been rejected by Ohio courts, it was wrong; to the extent PNC is relying upon *Hild* to support its argument of a non-existent exemption to the OSA in this case, PNC is also wrong.[6]

Similarly, PNC next relies upon *In re Nat'l Century* to support its erroneous notion that the Complaint should have, but did not, allege "that [the bank] aided [the seller] in selling notes," acted in some capacity as a trustee in the scheme, or otherwise aided Apostelos in his scheme. (ECF No. 14-1, PageIDs 95-96).  Not only is this a mischaracterization of the Complaint – Plaintiffs unequivocally alleged multiple times that PNC aided Apostelos in selling the Unregistered Securities (ECF No. 1, ¶¶ 7, 10, 21, 55, 58, 61, 64, 65, 79) – but also, *In re Nat'l Century* is not applicable to this case.

In *In re Nat'l Century*, National Century Financial Enterprises, Inc. was a healthcare finance firm that purchased accounts receivable from healthcare providers, giving hospitals and medical firms a steady cash flow in exchange for a discount on the receivables.  2006 U.S. Dist. LEXIS 72154 at *9.  To generate funds to buy receivables, National Century issued investment-

---

[6] PNC also cites *Cook v. Pepco* as being somehow helpful to PNC in this case.  It is not.  In *Cook,* plaintiffs asked the court to grant summary judgment on the grounds the bank was liable under § 408(b) of the Oklahoma Securities Act – predecessor of the current Oklahoma Uniform Securities Act – as a person who materially participated or aided in the sale of securities.  *Cook v. Pepco, Inc.*, [1987-88 Transfer Binder] Blue Sky L. Rep. (CCH) para. 72,694 (Okla. Dist. Ct. 1987).  In response, the bank argued it could not be liable for merely providing normal investment and financial services that any other bank or financial institution would provide.  *Id.*  Ultimately, the court held there is no immunity from liability when the bank or financial institution departs from normal banking or lending functions, and, like PNC here, the bank was much more involved than simply providing financing, and thus, the bank materially aided in the securities sales to the plaintiffs.  In its analysis, the court discussed both the "substantial factor" test and "but for" test, neither of which have been adopted in Ohio.

grade promissory notes.  *Id*.  Those notes were sold to institutional investors and were backed by the purchased receivables.  *Id*.  National Century used special-purpose entities to purchase receivables and issue notes, and Bank One served as the Indenture Trustee (under the terms of a Master Indenture) of one of those entities.  *Id*.  Ultimately, it was discovered National Century used noteholder money to purchase low-quality or even non-existent receivables from healthcare companies that National Century's owners had some financial interest in or controlled.  *Id*. at *11.  These healthcare companies became overfunded because National Century paid them for receivables that had little or no value.  *Id*.  The owners used their control of these healthcare companies to gain access to the overfunded amounts and in time, National Century went into bankruptcy, costing the investor plaintiffs an alleged aggregate loss of $ 2.6 billion.  *Id*.

The facts of *In re Nat'l Century*, however, do not fit with the facts of the present case. Specifically, Bank One did not engage in the same conduct as PNC, it did not serve as the primary conduit and accomplice of the fraudulent scheme, and the plaintiffs in that case did not allege Bank One aided National Century in selling notes; rather, the plaintiffs alleged Bank One failed to act to prevent the fraudulent behavior.  *Id*. at *36.  However, Bank One acted only under the terms set forth in its Master Indenture, which "created a narrow role for the Trustees, who undertook to perform 'only such duties as are specifically set forth in [the] Master Indenture.'" *Id*. at *18.  Any of the bad acts alleged by the plaintiffs was actually the responsibility of the special entities or the Servicer of the accounts per the terms of the Master Indenture and thus, the Court held, Bank One "cannot be held liable for breaching contractual duties that the Indenture assigned to [the entities], or the Servicer."  *Id*. at *21.  Here, PNC was not acting with the constraints of any agreements, and all of the knowledge and bad acts directly resulting in the Plaintiffs' losses are directly attributable to PNC and its pivotal role in aiding Apostelos in the

sale of Unregistered Securities.

Third, in *Wells Fargo*, the plaintiff was a victim of a Ponzi scheme operated by Diversified Lending Group ("DLG"). *Wells Fargo*, 2013-Ohio-855 at ¶ 2. American Benefits Concepts ("ABC"), a company that sold Medicare supplements and investments, offered the DLG investment to its clients. *Id*. ABC did not know the DLG securities were fraudulent. Some of ABC's clients would obtain mortgages on their homes in order to purchase the DLG investments. *Id*. ABC referred its customers to several mortgage banking firms, including AmeriFirst. *Id*. AmeriFirst closed a mortgage for the plaintiff who subsequently used the mortgage proceeds to purchase the DLG investment. *Id*. at ¶ 7. AmeriFirst played no role in the actual sale of the investment to the plaintiff and had no relationship with DLG. *Id*. at ¶ 30. The *Wells Fargo* court understandably concluded AmeriFirst did not participate in or aid in the illegal sales of securities because the mortgage services provided by AmeriFirst were not in any way tied to the actual sale of the illegal securities. *Id*. at ¶ 30. As alleged in the Complaint, the facts in *Wells Fargo* are not remotely close to what happened in this case.

Here, unlike AmeriFirst, PNC's participation was not distinct from or independent of the purchase of the Unregistered Securities. Instead, PNC served as the primary channel through which funds from the purchase of the securities flowed, and its participation was integral and necessary to the transaction. Without PNC single-handedly supporting Apostelos' ability to sustain fluid turnover of funds, Apostelos' scheme would have failed early. PNC was more than a passive observer and certainly engaged in more than simple "standard commercial banking activities." PNC's efforts to contort the holding of *Wells Fargo* into a blanket exemption to liability under O.R.C. § 1707.43 for alleged "standard commercial banking activities" misconstrues the facts of that case, the reasoning of that court, and the plain text of the statute.

Finally, PNC points to the *Boomershine* case to support its fictional exemption. (ECF No. 14-1, PageIDs 97-98). Again, assuming *arguendo*, the existence of a "standard commercial banking activities" exemption, the behavior in *Boomershine* is starkly different than PNC's. In *Boomershine*, the plaintiffs purchased the illegal securities in 1999. *Boomershine*, 2008-Ohio-14 at ¶ 4. AVS and US Bank, the defendants who were granted summary judgment, were not involved until 2002 - three years after the sale of securities. *Id.* It is not hard to comprehend why the *Boomershine* court found, on summary judgment, the bank could not have participated or aided in the sale of securities when the sale at issue occurred three years before the bank had any involvement of any kind with the alleged scheme.

In contrast, PNC's involvement here did not come years after the sale to the Plaintiffs; PNC's relationship with Apostelos dates back to at least April 2010, at the beginning of Apostelos' Ponzi scheme and well before Apostelos bilked the Plaintiffs out of nearly $6 million. By the time Apostelos set his sights on the Plaintiffs, PNC's role in the scheme was well established, as it not only participated and aided in the sales, but was a necessary party.

## C. The Red Flags and the Banking Statutes and Regulations are Relevant to Plaintiffs' Claims

PNC's final argument for dismissal is the "red flags" of which PNC was or should have been aware, as well as PNC's obligations under the rules and guidelines of the Bank Secrecy Act, the Patriot Act, the Anti-Money Laundering program, Know Your Customer rules, and Suspicious Activity Reports, "would not be relevant to whether PNC participated in the unlawful sale of unregistered securities." (ECF No. 14-1, PageIDs 101-102). Improperly relying again on the cases discussed above, PNC's interpretation of Plaintiffs' claims – and their argument regarding the relevance of these factors – misses the mark.

As this Court can clearly see from reviewing the Complaint, Plaintiffs have not brought

or attempted to bring any private action under the Bank Secrecy Act or Patriot Act. Further, Plaintiffs have not alleged PNC's failure to observe or act upon the "red flags" permeating Apostelos' accounts, in and of itself, subjects them to liability. Rather, Plaintiffs have set forth in their Complaint – as well as in this Opposition – how these "red flags," combined with the overt efforts PNC made to subvert or blatantly ignore the guidelines and rules set forth by the Bank Secrecy Act, the Patriot Act, the Anti-Money Laundering program, Know Your Customer rules, and Suspicious Activity Reports, demonstrate PNC's knowledge of Apostelos' Ponzi scheme and its participation in the unlawful sale of the Unregistered Securities.

PNC's quest for a judicially recognized exception is a futile one. If the Ohio Legislature wanted to exempt PNC's conduct, it would have. It did not. And it is not just the Ohio Legislature that has not adopted the exception PNC seeks. The Ohio Department of Commerce, Division of Securities is specifically authorized to exempt, by rule adopted by the division, persons from liability imposed by Section 1707.43. *See* O.R.C. § 1707.431(C). The Division of Securities, like the Ohio Legislature, has not exempted the likes of PNC from the protections afforded the investing public by the OSA. This Court must decline to do what the Ohio Legislature and Division of Securities could have done if they deemed appropriate.

**V.    <u>CONCLUSION</u>**

The allegations against PNC are sufficiently stated in the Complaint and provide a plausible theory for recovery. There is no "standard commercial banking activities" exemption to the participation liability of Section 1707.43, and even if there were, Plaintiffs have alleged much more than "standard commercial banking activities." The Complaint alleges knowledge and participation by PNC in the sale of Unregistered Securities in violation of the OSA. At this stage, that is what is required. Accordingly, PNC's motion to dismiss must be overruled.

Respectfully submitted,


/s/
Toby K. Henderson     (0071378)
          Trial Attorney
Matthew G. Bruce      (0083769)
SEBALY SHILLITO + DYER
A Legal Professional Association
1900 Kettering Tower
40 North Main Street
Dayton, Ohio  45423
937/222-2500
937/222-6554 (fax)
thenderson@ssdlaw.com

and

Gary A. Gotto
KELLER ROHRBACK, L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012
602/248-0088
602/248-2822 (fax)
ggotto@kellerrohrback.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing document was filed and served electronically

through the Court's ECF system on October 25, 2016, upon:

Thomas D. Warren, Esq.
BAKER & HOSTETLER, LLP
Key Tower, Ste. 2000
127 Public Square
Cleveland, Ohio 44114
twarren@bakerlaw.com

*Attorneys for Defendants*

/s/ _____
Toby K. Henderson

2383542.7